# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

-----------------

## No. 97-10907

-----------------

Charles Freeman and Rosalyn Brown,

>>> Plaintiffs-Appellees-Cross-Appellants,

### VERSUS

City of Dallas,

>>> Defendant-Appellant-Cross-Appellee.

-----------------

Appeals from the United States District Court
for the Northern District of Texas

-----------------

August 18, 1999

Before EMILIO M. GARZA, BENAVIDES, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

This case presents the questions of whether the seizure and destruction of the Plaintiffs' vacant apartment buildings by the City of Dallas, as "urban nuisances," based only on the findings and order of a panel of the City's Urban Rehabilitation Standards Board: (1) violated the Due Process Clauses of the Fifth and Fourteenth Amendments because the owners were not given an opportunity for an adversary hearing before a neutral magistrate and a judicial determination prior to the seizure and destruction of their real property; and (2) violated the Fourth Amendment, because the City seized and destroyed the Plaintiffs' property without a warrant issued by a magistrate based on a finding of probable cause.

A majority of this panel holds that the notice and hearings provided by the City satisfied the constitutional Fifth and Fourteenth Amendment's guarantees against deprivation of property without

1

due process of law. A different majority of this panel holds that the Fourth and Fourteenth Amendments were violated when the City seized and destroyed the Plaintiffs' property without a warrant issued by a judicial officer based on probable cause. The district court's judgment reaching the same results is affirmed.

## I. FACTS AND PROCEDURAL HISTORY

Charles Freeman and Rosalyn Brown owned two apartment buildings in Dallas, Texas. Ms. Brown bought the building located at 2621 Meyers Street on December 26, 1992, and filed a warranty deed in the Dallas County Deed Records on July 1, 1993. Ms. Brown bought the building located at 2611 Meyers Street on April 11, 1993, and filed a warranty deed on August 3, 1994. Warranty deeds were filed on August 11, 1994, in which Ms. Brown transferred a one percent undivided interest in both buildings to her brother, Charles Freeman. The buildings were vacant when Ms. Brown bought them and remained unoccupied until they were demolished.

The City of Dallas established the Urban Rehabilitation Standards Board (URSB) to determine whether property condition reports by city inspectors constitute violations of the City's building code. The URSB is composed of 30 members (and 8 alternates) who are appointed by the Dallas City Council. The URSB may determine, after a hearing, whether a given structure is an "urban nuisance" and take various remedial measures. The URSB is authorized by city ordinance to order repairs, receivership, the closing and vacating of buildings, demolition, and civil penalties up to $2,000 a day against property owners who fail to repair or demolish a structure after a valid determination and order has been issued by the URSB. Dallas City Code, ch. 27, art. II, § 27-8.

In April and July of 1993, City code inspectors from the Department of Housing and Neighborhood Services reported to the URSB that the Plaintiffs' two apartment buildings were in violation of the City's building code. According to the inspectors the 2611 Meyers Street building was in need of repairs estimated to cost $84,290.00, and the 2621 Meyers Street building needed repairs costing $108,680.00.

The URSB scheduled hearings to determine whether the buildings were in violation of the city

building code and whether remedial steps should be taken. The URSB functions through hearing panels composed of members of the URSB. The Dallas City Code establishes the procedure to be used by the panels. At a hearing "an owner, lessor, occupant, or leinholder may present witnesses in his own behalf and is entitled to cross-examine any witnesses appearing against him." Dallas, Tex., Code ch. 27, art. II, § 27-9(c). The decision of a hearing panel is final except that rehearings may be granted in certain instances. Also, the code authorizes an affected property owner to appeal from the panel decision to the state district court for a "limited hearing under the substantial evidence rule." Id. § 27-9(e).

Notice of the URSB panel hearings with respect to the Plaintiffs' two buildings were mailed to the persons listed as owners on the title records. With regard to the building at 2621 Meyers Street, the City sent notices to Rosalyn Brown and K.K. Stanfield (the previous owner) of the panel hearing "To Consider an Order of Repair or Correction of a Potential Urban Nuisance." Ms. Brown signed the return receipt on February 28, 1994. This notice listed all of the possible actions that the URSB could take, including demolition: "If the board orders demolition, closure, vacation or removal, and if it is done by city forces, you will be required to pay for the expenses or a lien will be placed against the property." This notice concluded by stating, "It is important that you attend this hearing or send a representative." With regard to the structure at 2611 Meyers Street, an identical notice was sent to the person listed as the owner on the title, Robert Burkhead. Ms. Brown had purchased the property but had not yet filed her warranty deed. It appears that neither Burkhead nor the Plaintiffs received advance notice of the hearing with respect to the 2611 Meyers Street building, but Mr. Freeman learned that it was also involved when he attended the hearing in response to the notice sent to Ms. Brown concerning the 2621 Meyers Street property.

At the hearing concerning the two apartment buildings on February 28, 1994, Mr. Freeman testified and was questioned by the panel members. The panel looked at pictures of the structures, questioned Mr. Freeman about what plans he had to repair them, and asked whether he had the money or the time to accomplish the tasks. Mr. Freeman testified that he intended to repair the

3

buildings himself and requested the panel to allow him sufficient time to do so. The panel members voiced their concerns about Mr. Freeman's ability to obtain the repair materials and his ability to renovate them by himself. The panel voted unanimously to demolish both structures.

Following this hearing, Freeman signed two notices of demolition for both apartment buildings. The City then sent out a "Notice of Demolition Order" for each building. As to the 2611 Meyers Street structure, the City sent notices to Freeman and Robert Burkhead. Freeman signed the return receipt on March 11, 1994, but Burkhead's notices were returned "Attempted--Not Known." Notices of a demolition order were sent to Rosalyn Brown and Charles Freeman as to the URSB's action concerning the 2621 Meyers Street building. Freeman signed return receipts of the notices on March 11, 1994. Each notice stated that the owners "may exercise your right to an administrative rehearing and review of this demolition order."

Mr. Freeman asked for and received a rehearing from the URSB on May 23, 1994. At the rehearing, the URSB members questioned Mr. Freeman about the two buildings, whether he had the materials to repair them, and whether any repairs had been made to the buildings since the last hearing. Mr. Freeman stated that had received some donated materials and he submitted pictures of one unit in the 2621 Meyers Street building that he had repaired. Several members of the URSB panel expressed disbelief that Mr. Freeman could renovate the units for $2000 each as he claimed. The URSB panel again voted to demolish both structures -- the vote was unanimous as to the 2611 Meyers Street building, and it was five to two as to the 2621 Meyers Street building.

On the day of the hearing, Mr. Freeman signed the "Notice of Demolition" of both the 2611 and 2621 Meyers Street buildings. Neither Freeman nor Brown appealed the URSB panel decision to the state district court. A notice entitled "Appeal Denied/Demolition" was sent to the owners of each building. Notice of the proposed demolition of 2611 Meyers Street was mailed to Freeman and Burkhead; notice of the proposed demolition for the other building was mailed to Freeman and Brown. Even though the notices for Freeman and Brown were sent to the same addresses at which

4

they had received mail about earlier hearings, all of these were returned as "Unclaimed." No further notice was given to the Plaintiffs before the buildings were demolished in late December 1994. The costs of demolition by the City were assessed against Freeman and Brown in the amounts of $7954.72 for the building at 2611 Meyers Street and $7655.55 for the 2621 Meyers Street property.

On April 23, 1996, Freeman and Brown brought suit against the City of Dallas under 42 U.S.C. § 1983 in federal district court. Freeman and Brown contended that the City violated their rights under the Fourth, Fifth, and Fourteenth Amendments because the City did not provide adequate due process prior to demolishing the apartment buildings, did not obtain a warrant before seizing and destroying Plaintiffs' buildings, and did not provide any due process to the Plaintiffs prior to placing a lien against the property for the costs of demolition.

On cross motions for summary judgment, the trial judge partially granted Plaintiffs' motion, concluding that the City had violated the Fourth and Fourteenth Amendments by seizing and destroying Plaintiffs' buildings without a judicial warrant based on probable cause, and partially granted the City's motion by rejecting the Plaintiffs' Fifth and Fourteenth Amendments' due process claim. The case was submitted to a jury to determine damages under § 1983 for the City's warrantless seizure and destruction of the apartment buildings. The jury awarded $20,000 in damages to Freeman and Brown. The City appealed and the Plaintiffs cross-appealed following entry of this judgment.

## II. FOURTH AMENDMENT[*]

The government's seizure of a person's property implicates the Fourth Amendment, which is "made applicable to the States by the Fourteenth[.]" Soldal v. Cook County, 506 U.S. 56, 61 (1992) (citing Ker v. California, 374 U.S. 23, 30 (1963)).

In this case, the City of Dallas seized and destroyed the buildings owned by the plaintiffs without a warrant. This act undoubtedly constituted a "seizure" because a seizure occurs when "'there is some meaningful interference with an individual's possessory interests in that property.'"

---

[*]Judge Garza does not concur in this part of the opinion and dissents therefrom with reasons.

5

Soldal, 506 U.S. at 61 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)). The Fourth Amendment's protections extend not only to searches and seizures incident to criminal investigations but also to administrative searches and seizures in the civil context. Id. at 67.

The protection afforded by the Fourth Amendment extends to an individual's possessory interests in property, even if his expectation of privacy in that property has been completely extinguished and no search within the meaning of the Amendment has taken place. Soldal, 506 U.S. at 62-63, 68; United States v. Jacobsen, 466 U.S. 109, 113 (1984); United States v. Paige, 136 F.3d 1012, 1021 (5th Cir. 1998). Subject only to a few specifically established exceptions not applicable here, seizures conducted outside the judicial process, without prior approval by a judge or magistrate, based on probable cause, are per se unreasonable under the Fourth Amendment. Minnesota v. Dickerson, 508 U.S. 366, 372 (1993); Paige, 136 F.3d at 1021.

The seizures in this case do not fall within an exception to the warrant requirement fashioned by United States v. Jacobsen, 466 U.S. 109 (1984), and United States v. Place, 462 U.S. 696 (1983), allowing courts to decide after the fact whether a warrantless seizure was constitutionally unreasonable by balancing individual and government interests. Essentially, Jacobsen and Place hold that (1) a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests by, for example, converting a temporary deprivation of possessory interests into a permanent one; and that (2) to assess the reasonableness of the government conduct, a court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interests alleged to justify the intrusion. In Jacobsen, the Supreme Court applied this test and concluded that the field test destruction/seizure of a trace amount of material which had already been lawfully detained, was reasonable because loss of the trace amount had only a de minimis impact on any protected property interest and that, under these circumstances, the safeguards of a warrant would only minimally advance Fourth Amendment interests. Jacobsen, 466 U.S. at 125. The Court

6

in Jacobsen added a significant caveat: "Of course, where more substantial invasions of constitutionally protected interests are involved, a warrantless search or seizure is unreasonable in the absence of exigent circumstances." Id. at 125 n. 28 (citing authorities).

Thus, the Jacobsen-Place balancing test is not appropriate in this case. The seizure of the plaintiffs' real property was not lawful in its inception. Because their seized buildings were totally and permanently destroyed, it cannot be said that the seizure had only a de minimis impact on their protected property interests. The invasions of the plaintiffs' protected interests were more than "substantial." Under these circumstances, it cannot be said that the safeguards of a warrant would have only minimally advanced Fourth Amendment interests. Another panel of this court recently held that the holding in Jacobsen would not be extended to cases involving permanent seizures. United State v. Paige, 136 F.3d at 1022. Because there were no exigent circumstances, the warrantless seizure and destruction of plaintiffs' property was unreasonable and a violation of the Fourth Amendment. Jacobsen, 466 U.S. at 125 n.28.

### III. DUE PROCESS[**]

The district court granted the City of Dallas's motion for summary judgment on the issue of whether due process requirements were satisfied in the seizure and destruction of Plaintiff's property. This court reviews a grant of summary judgment de novo, applying the same standard as the district court. Martin v. Memorial Hospital, 130 F.3d 1143, 1147 (5th Cir. 1997). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the non-movant,

presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The Fourteenth Amendment prohibits the government from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. This guarantee affords

---

[**]Judge Dennis does not agree with the majority as to this part of the opinion and dissents therefrom with reasons.

7

procedural protections.  Daniels v. Williams, 474 U.S. 327, 331-32 (1986).  The government must give reasonable notice to an individual of its intention to deprive him of life, liberty, or property.  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313-15 (1950).  It also must provide him with a meaningful opportunity to be heard.  Matthews v. Eldridge, 424 U.S. 319, 333 (1976); Mullane, 339 U.S. at 313-14.  Following Matthews, we assess what process is due by considering and balancing three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Matthews, 424 U.S. at 335.  This approach reflects the fact that "due process is flexible and calls for such procedural protections as the particular situation demands."[3]  Morrissey v. Brewer, 408 U.S. 471, 481 (1972); accord Faulder v. Texas Bd. of Pardons & Paroles, 178 F.3d 343, 345 (5th Cir.) (per curiam) ("Procedural due process is an inherently flexible concept."), cert. denied, ___ U.S. ___, 119 S.Ct. 2362, ___ L.Ed.2d ___ (1999).

The Plaintiffs contend that they were denied a meaningful opportunity to be heard on the future of the apartment buildings because they were not told that the Department of Housing and Neighborhood Services had briefed panel members on their properties, they were not provided with the Department's information on their properties, they were not given notice of the tours of their properties by URSB panel members, and the Department officials who reported the code violations were not present at either the hearings or the rehearings.  We generally find a procedure to violate due process when the government fails to reveal its evidence.  See Greene v. McElroy, 360 U.S. 474, 492-97 (1959).  Non-disclosure by the government poses the risk of an erroneous deprivation

---

[3]Applying the three-factor Matthews test, we usually hold that the individual must be heard prior to the deprivation.  See Zinermon v. Burch, 494 U.S. 113, 127-28, 110 S.Ct. 975, 984, 108 L.Ed.2d 100, ___ (1990).  However, when pre-deprivation procedural safeguards cannot be expected to protect against the type of deprivation involved, we find that a post-deprivation hearing satisfies due process.  See id. at 128-30, 139, 110 S.Ct. at 984-85, 990, 108 L.Ed.2d at ___.

because it forecloses the individual from testing the accuracy of the government's evidence. See id. at 496-97. This threat is so great that it generally outweighs considerations favoring non-disclosure. Robbins v. United States R.R. Retirement Board, 594 F.2d 448, 451-52 (5th Cir. 1979). Cf. Joint Anit-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring) ("No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.").

We conclude that the URSB panel related to the Plaintiffs the evidence supporting the Department's recommendation to level the apartment buildings. During the rehearings, as well as the tour of 2621 Meyers Street preceding them, URSB panel members conveyed to Freeman their concerns over the condition of the apartment buildings. Other members alerted him to the repair cost estimates.[4] Freeman chose not to call the Department officials who had cited the apartment buildings for code violations or any other persons as witnesses. Nor did Freeman seek to learn more about the repair cost estimates after the panel informed him of them. See Richardson v. Perales, 402 U.S. 389, 407 (1971) (finding that the individual had an opportunity to confront the evidence against him where the government's reports were available to him, and the witnesses were known and were subject to subpoena and cross examination); Cf. City of West Covina v. Perkins, 524 U.S. 234, ___ 119 S.Ct. 678, 681-82, 142 L.Ed.2d 636, ___ (1999)(holding that the government need not tell an individual how to recover property seized pursuant to a police search where the state statutes and caselaw do so). Because the URSB panel made Freeman aware of the circumstances favoring demolition, Plaintiffs' assertion that the way in which the Board reached the decision to destroy the apartment buildings failed to accord with due process is without merit.[5]

---

[4]Before the rehearings, the URSB panel met with Department staffers to discuss Freeman's request to waive the rehearing fees. According to the transcript of this briefing, this discussion did not focus on whether to raze the apartment buildings.

[5]The events surrounding the rehearings make any non-disclosure at the earlier hearings immaterial. See Glenn v. Newman, 614 F.2d 467, 470, 473 (5th Cir. 1980) (holding that the decision to terminate the plaintiff after an ex parte hearing did not offend due process because the mayor and city council later heard the plaintiff's evidence and reaffirmed their decision to terminate).

9

The Plaintiffs also contend that the absence of a hearing before the liens attached to their properties violated due process. They assert that this omission violated due process because it resulted in the City incurring unreasonable demolition costs, which were passed on to them.[6]

The Plaintiffs' argument lacks merit. The City gave Freeman and Brown thirty days to effect the demolitions. This option protected them against the risk of exorbitant demolition costs. A hearing on costs before the demolition could have done no more. Accordingly, we conclude that the lack of a hearing before the attachment of the liens did not violate due process. Cf. Zinermon v. Burch, 494 U.S. 113, 127-30 (1990).

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's summary judgments in favor of the City of Dallas on the due process claim and in favor of the Plaintiffs on their Fourth Amendment claim, and the award of damages under § 1983 for the violation of the Plaintiffs' Fourth Amendment rights.

---

[6]The Plaintiffs point to the more than $2000 disparity between the actual and estimated demolition costs for each apartment building as proof that the City paid too much.

EMILIO M. GARZA, Circuit Judge, dissenting in part:

Charles Freeman and Rosalyn Brown allege that the City of Dallas ("City") violated their Fourth and Fourteenth Amendment rights. The district court granted summary judgment to Freeman and Brown on the Fourth Amendment claim, and to the City on the Fourteenth Amendment claims. Judge Benavides and I agree with the second holding. I alone disagree with the first one. Accordingly, I dissent in part.

I

Brown acquired properties known as 2611 Meyers Street and 2621 Meyers Street located in Dallas, Texas. A vacant, dilapidated eight-unit apartment building stood on each lot. Brown intended to rent the apartment units after making repairs.

The Department of Housing and Neighborhood Services ("Department") cited both apartment buildings for non-compliance with the City's Minimum Urban Rehabilitation Standards Code ("Code"). When the Code violations were not corrected, it referred the matter to the Urban Rehabilitation Standards Board ("Board"), and recommended demolition.

After conducting a title search, the Board mailed a notice of hearing on each of the properties to the owner of record.[7] The notice announced that the Board might order demolition to remedy the Code offenses. It further stated that the property owner would "be given an opportunity to present evidence and witnesses if so desired."

In preparation for the hearings, Department staffers briefed the panel of Board members assigned to decide the fate of the Meyers Street properties. They also provided panel members with information on the properties, including repair cost estimates,[8] and accompanied some of them on a

---

[7]    The Board did not give Freeman notice because he had no interest in either property at the time. It sent Brown a notice on 2621 Meyers Street, the property of which she was the owner of record. (Brown became the owner of record for 2611 Meyers Street after the Board decided how to address the Code violations.)

[8]    The Department determined that the estimated cost of repairs totaled $84,290.00 for 2611 Meyers Street and $108,680.00 for 2621 Meyers Street.

11

tour of the premises.

Freeman appeared at the hearings, identifying himself as the "attorney-in-fact for Brown" and as an owner of 2611 and 2621 Meyers Street. He reported that he was without funds, and asked for more time to make repairs. Because of Freeman's inability to finance repairs and doubt about his ownership, the panel ordered the destruction of each apartment building as an urban nuisance.[9]

Freeman successfully petitioned the panel for a rehearing. The Board then mailed a notice of the rehearing on 2611 Meyers Street to Freeman and a notice of the rehearing on 2621 Meyers Street to Freeman and Brown. The substance of these notices was identical to that of the earlier hearing notices.

Two panel members visited the properties before the rehearings. They examined the exterior of the apartment building at 2611 Meyers Street. They ran into Freeman at 2621 Meyers Street. He showed them repairs inside of the apartment building. They told him to bring photographs of the repairs to the rehearings.[10]

At the rehearings, the Department showed pictures of the apartment buildings' exteriors. Freeman said that he anticipated acquiring most of the materials required to make repairs at little or no cost. He further stated that he hoped to finance repairs through a loan from the City, and had received a commitment from relatives in the construction business to help him make repairs if he

---

[9] The Code defined an "urban nuisance" as the following:

[A] premises or structure that:

(A) is reasonably dangerous to the physical health or safety of an occupant or other person; or

(B) because of violations of [the Code] . . ., its state of disrepair is such that it could reasonably cause injury, damage, harm, or inconvenience to a considerable portion of the community in the use and enjoyment of property, materially interfering with the proper use or comfort and enjoyment of surrounding property, taking into consideration the nature and use of the properties in the area and the character of the community in which they are situated, which condition would be substantially offensive and annoying to persons of ordinary sensibilities, tastes, and habits living in the community.

DALLAS, TEX., CODE ch. 27, art. I, § 27-3(23) (1993).

[10] Before the rehearings, the panel met with Department staffers to discuss Freeman's request to waive the rehearing fees.

12

secured funding from the City. Freeman also submitted photographs of repairs made to the interior of the apartment building at 2621 Meyers Street and a list of materials that he had collected already. Finally, he asserted that he could upgrade each unit of the apartment building at 2621 Meyers Street for $2000.00. Panel members responded skeptically to Freeman's presentation. Among their comments to Freeman were the following:

> MR. KIRKPATRICK: And I strongly appreciate you [sic] intent with what you would like to do with the property [*i.e.,* 2611 Meyers Street]. The property is in serious disarray))I mean, foundation, structurally. We saw . . . looked at the staff recommendations for improvement. Are you aware of the total of which they have estimated, $84,310?
>
> . . .
>
> MS. LOCKLEY: Are you aware of the amount of money the staff has sort of generally come up with to say how much your expenses might be for the repairs [to 2621 Meyers Street]?

Despite such statements, Freeman neither inquired about the basis for the repair cost estimates nor asked to question the Department officials responsible for them.

The panel again voted to declare the apartment buildings urban nuisances and to order their destruction because it still was unpersuaded that Freeman possessed the financial ability to make repairs in a timely manner. Freeman received a notice of demolition for each property at the end of the rehearings. The notice identified the parcel by lot and block number, as well as by street address, and stated that the panel's decision could be appealed to state district court for review under the substantial evidence rule.

The Board also sent a notice of the order to demolish the apartment building at 2611 Meyers Street to Freeman and a notice of the order to demolish the apartment building at 2621 Meyers Street to Freeman and Brown. Each notice declared, in part:

> If you do not demolish the structure(s) within the time above indicated [*i.e.,* 30 days], the city will arrange to have this work done and the expense of that demolition performed under contract with the city will constitute a lien on the real property on which the structure(s) were located, and that lien will run with the land.

Freeman and Brown did not petition the state district court to review the demolition orders. When they failed to raze the apartment buildings within thirty days, the City hired a contractor to do

13

so. It did not convene a hearing to discuss demolition costs before the contractor undertook performance. Nor did it obtain a judicial warrant. After the demolitions, a lien attached to each piece of property equal to the cost of demolition))$7954.72 for 2611 Meyers Street and $7655.55 for 2621 Meyers Street. Each lien exceeded by more than $2000.00 the demolition cost estimate that the Department had made when it had found the apartment buildings in violation of the Code.

Freeman and Brown filed a 42 U.S.C. § 1983 action against the City. They alleged that the destruction of apartment buildings constituted an unreasonable seizure in violation of the Fourth Amendment. They also maintained that the way in which the panel had decided to demolish the apartment buildings and the imposition of the liens contravened the Fourteenth Amendment's guarantee of procedural due process.

Freeman and Brown moved for summary judgment on the Fourth Amendment claim. In response, the City requested summary judgment on all claims. The district court granted summary judgment to Freeman and Brown on the Fourth Amendment claim, denied the City's cross-motion for summary judgment on the Fourth Amendment claim, and granted summary judgment to the City on the Fourteenth Amendment claims. After a trial on damages for the Fourth Amendment violation, a jury awarded $20,000.00 to Freeman and Brown. Timely appeals followed the entry of final judgment.

## II

We review a grant of summary judgment *de novo. See United States v. Johnson*, 160 F.3d 1061, 1063 (5th Cir. 1998). Summary judgment occurs if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Our review encompasses only the record on which the district court based its ruling. *See Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 n.10 (5th Cir. 1992).

## III

The City argues that the district court erred in granting summary judgment to Freeman and Brown on the Fourth Amendment claim. In its view, the district court wrongly held that the lack of

a valid judicial warrant rendered the demolitions of the apartment buildings impermissible seizures.[11]

The Fourth Amendment declares:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, suppo rted by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S.CONST. amend. IV. In determining if a particular governmental action violates this constitutional guarantee, we initially must consider whether or not the action was regarded as an unlawful search or seizure under the common law when the Fourth Amendment was framed. *See Wyoming v. Houghton*, ___ U.S. ___, ___, 119 S. Ct. 1297, 1300, 143 L. Ed. 2d 408, ___ (1999). When this examination of the historical record yields no answer, we must decide whether or not the action was reasonable. *See id.*; *see also Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L. Ed. 2d 347, ___ (1996) ("the touchstone of the Fourth Amendment is reasonableness" (internal quotations omitted)); *Carroll v. United States*, 267 U.S. 132, 147, 45 S. Ct. 280, 283, 69 L. Ed. 2d 543, ___ (1925) ("The Fourth Amendment does not denounce all searches and seizures, but only such as are unreasonable."). A "reasonableness determination . . . reflects a 'careful balancing of governmental and private interests.'" *Soldal v. Cook County, Ill.*, 506 U.S. 56, 71, 113 S. Ct. 538, 549, 121 L. Ed. 2d 450, ___ (1992) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S. Ct. 733, 742, 83 L. Ed. 2d 720, ___ (1985)). We deem a seizure reasonable when the government has acted pursuant to a valid judicial warrant) ) that is, a warrant supported by probable cause that particularly describes the things to be seized. *See United States v. Place*, 462 U.S. 696, 701, 103 S. Ct. 2637, 2641, 77 L. Ed. 2d 110, ___ (1983). We also uphold a seizure made without a valid judicial warrant if it strikes the appropriate balance between the competing private and government interests. *See Johnson v. United States*, 333 U.S. 10, 14-15, 68 S. Ct. 367, 369, 92 L. Ed. 436, ___ (1948). For example, in some circumstances we may find permissible a warantless seizure of property that occurs after the

---

[11] The City does not contest that the demolitions were seizures. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 72, 113 S. Ct. 538, 549, 121 L. Ed. 2d 450, ___ (1992) (tearing mobile home from its foundation and towing it to another lot is a seizure).

government has provided the owner with due process. *See G. M. Leasing Corp. v. United States*, 429 U.S. 338, 352 n.18, 97 S. Ct. 619, 628 n.18, 50 L. Ed. 2d 530, ___ n.18 (1977) ("These cases, of course, center upon the Due Process Clause rather than the Fourth Amendment, but the constitutional analysis is similar and yields a like result.").

I agree with the City that the demolitions were reasonable seizures.[12] The intended commercial use of the apartment buildings lessened the interests of Freeman and Brown. *See New York v. Burger*, 482 U.S. 691, 700, 107 S. Ct. 2636, 2642, 96 L. Ed. 2d 601, ___ (1987) ("An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home."); *Hroch v. City of Omaha*, 4 F.3d 693, 697 (8th Cir. 1993) (demolition case) (finding that the owner's interest in commercial property "was negligible because he failed to take 'normal precautions to maintain his privacy'"). In contrast, the City possessed a strong interest in demolition)) the need to protect the public from hazardous buildings. *See Camara v. Municipal Court of City & County of San Francisco*, 387 U.S. 523, 537, 87 S. Ct. 1727, 1735, 18 L. Ed. 2d 930, ___ (1967) (discussing when a housing inspector may inspect buildings without a warrant) ("the public interest demands that all dangerous conditions be prevented or abated"). It, moreover, effected the seizures after Freeman and Brown had received reasonable notice, a meaningful opportunity to be heard, and a chance to seek judicial review. This due process guarded the interests of Freeman and Brown just as well as a valid judicial warrant. *See Samuels v. Meriwether*, 94 F.3d 1163, 1168 (8th Cir. 1996) ("[Our] . . . holdings suggest that an abatement [of a nuisance] carried out in accordance with procedural due process is reasonable [as to the Fourth Amendment] in the absence of any factors that outweigh governmental interests."); *Connor v. City of Santa Ana*, 897 F.2d 1487, 1495 (9th Cir. 1990) (Trott, J., dissenting) ("A warrant)) and the process used to attain it)) would have added nothing to the [property owners'] . . . privacy in light of the equivalent substitute process they did receive, or to the independent [judicial] review to which

---

[12] Neither side makes arguments regarding the lawfulness of the type of seizures at issue here under the common law when the Fourth Amendment was framed. Instead, everyone focuses on the reasonableness of the seizure.

they were entitled."). The City therefore did not violate the Fourth Amendment in this case.[13] The

majority errs in holding otherwise.

IV

Unlike the majority, I conclude that the district court improperly granted summary judgment

to Freeman and Brown on the Fourth Amendment claim.

Accordingly, I dissent in part.

---

[13] The majority apparently patterns its analysis of the Fourth Amendment claim on *Connor v. City of Santa Ana*, 897 F.2d 1487 (9th Cir. 1990). In *Connor,* municipal authorities claimed that a warrantless confiscation of two abandoned automobiles located on private property was permissible because the entry and seizure were preceded by numerous hearings and appeals. *See id.* at 1489, 1490-91. The Ninth Circuit rejected the argument, holding that the Fourth Amendment obliged the officials to secure a valid judicial warrant because of the absence of "any case . . . [that] has created a 'process' exception to the warrant requirement." *Id.* at 1491.

I disagree with *Connor.* When a warantless search or seizure fails to fit within any of the exceptions to the warrant requirement, we do not, as the Ninth Circuit did in *Connor* and as the majority does in this case, reflexively invalidate it. Rather, we balance the governmental and private interests to determine the legality of the warrantless search or seizure. *See Whren v. United States*, 517 U.S. 806, 817, 116 S. Ct. 1769, 1776, 135 L. Ed. 2d 89, __ (1996) ("It is of course true that in principle every Fourth Amendment case, since it turns upon a 'reasonableness determination,' involves a balancing of all relevant factors."); *California v. Acevedo*, 500 U.S. 565, 581-84, 111 S. Ct. 1982, 1992-94, 114 L. Ed. 2d 619, ___ (1991) (Scalia, J., concurring in the judgment) (recognizing that reasonableness, not the existence of a valid judicial warrant, is the Fourth Amendment's chief concern); *Johnson v. United States*, 333 U.S. 10, 14-15, 68 S. Ct. 367, 369, 92 L. Ed. 436, ___ (1948) ("When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by the judicial officer, not by a police-man or Government enforcement agent. There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with.").

17

DENNIS, Circuit Judge, dissenting in part:

A governmental seizure of a person's property implicates two explicit textual sources of constitutional protection, the Fourth and Fifth Amendments. United States v. James Daniel Good Real Property, 510 U.S. 43, 49-50 (1993); Soldal v. Cook County, 506 U.S. 56, 61, 70-71 (1992). Although the decision in James Daniel Good Real Property was based upon the procedural protections of the Fifth Amendment's Due Process Clause, the similarly worded procedural protections of the Fourteenth Amendment's Due Process Clause apply with equal force to states and municipalities.[14]

The City does not, and could not, dispute that the seizure and

_____

[14]The Supreme Court has held that the Fourteenth Amendment's Due Process Clause "legitimately operates to extend to the citizens and residents of the States the same protection against arbitrary state legislation, affecting life, liberty and property, as is offered by the Fifth Amendment against similar legislation by Congress." Hibben v. Smith, 191 U.S. 310, 325 (1903). Of the guarantees of the Fifth Amendment, only the grand jury clause has been held not to be applicable to the states. 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 14.2, at 347-48 (2d ed. 1992) (citing Hurtado v. California, 110 U.S. 516 (1884)). The Fifth Amendment prohibitions of compulsory self-incrimination and double jeopardy were made applicable to the states in Malloy v. Hogan, 378 U.S. 1 (1964), and Benton v. Maryland, 395 U.S. 784 (1969), respectively. In addition, although the Fifth Amendment's just compensation provision has not "technically" been incorporated against the states, "the Court has held that the fourteenth amendment due process guarantee provides the same safeguard against a state's taking of property without just compensation." Rotunda & Nowak, supra, § 14.2, at 350 (citing Chicago B. & Q. R. Co. v. Chicago, 166 U.S. 226 (1897)). See also Hurtado v. California, 110 U.S. 516, 541 (1884) (Harlan, J., dissenting) ("[T]he 5th [amendment] provided that 'no person shall be deprived of life, liberty or property, without due process of law.' This language is similar to that of the clause of the 14th amendment now under examination. That similarity was not accidental, but evinces a purpose to impose upon the States the same restrictions, in respect of proceedings involving life, liberty and property, which had been imposed upon the General Government.").

destruction of the plaintiffs' real property deprived them of property interests protected by the Fifth and Fourteenth Amendments' Due Process Clauses. The City argues, however, that a hearing before a panel of the City's own Urban Rehabilitation Standards Board afforded the plaintiffs all the process they were due before their property was seized and destroyed. Although the majority agrees, I believe that in the absence of an extraordinary situation, which did not exist in the present case, the Due Process Clauses require that, before a person is deprived of his real property by the government, he must be given notice and an opportunity for a meaningful hearing before a neutral magistrate, and that there must be a judicial determination that the seizure is justified.

Where the government seizes property not to preserve evidence of criminal wrongdoing but to assert ownership and control over the property, its action must also comply with the procedural protections of the Due Process Clauses of the Fifth and Fourteenth Amendments. See United States v. James Daniel Good Real Property, 510 U.S. 43, 49-50 (1993), and footnote 1, supra. The Supreme Court's precedents establish the general rule that Due Process requires that, absent an extraordinary situation, a party cannot invoke the power of the state to seize a person's property without a prior judicial determination that the seizure is justified. United States v. $8,850, 461 U.S. 555, 562 n.12 (1983) (citing Boddie v. Connecticut, 401 U.S. 371, 378-379 (1971)). See also North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601

19

(1975); <u>Fuentes v. Shevin</u>, 407 U.S. 67 (1972); <u>Sniadach v. Family Finance Corp.</u>, 395 U.S. 337 (1974). <u>Cf.</u> <u>Mitchell v. W.T. Grant Co.</u>, 416 U.S. 600 (1974). Due Process also requires that individuals must receive notice and an opportunity to be heard before the government deprives them of property. <u>James Daniel Good Real Property</u>, 510 U.S. at 48 (citing <u>United States v. $8,850</u>, supra; <u>Fuentes v. Shevin</u>, supra; <u>Sniadach v. Family Finance Corp.</u>, 395 U.S. at 342 (Harlan, J., concurring); <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313 (1950)).

In <u>United States v. James Daniel Good Real Property</u>, supra, the Supreme Court held that, in the absence of exigent circumstances, the Due Process Clause requires the government to afford notice and a meaningful opportunity to be heard in an adversary hearing, to ensure the requisite neutrality that must inform governmental decisionmaking, before seizing real property subject to civil forfeiture. <u>Id.</u> at 48, 53-56. The protection of an adversary hearing before a neutral magistrate is of particular importance where the government has a direct pecuniary interest in the outcome of the proceeding. <u>Id.</u> at 55-56. In <u>James Daniel Good Real Property</u>, the Supreme Court emphasized that "[t]he constitutional limitations we enforce in this case apply to real property in general, not simply to residences." <u>Id.</u> at 61.

Accordingly, the Due Process requirements of notice, a meaningful adversary hearing before a neutral magistrate, and a judicial determination of justification must be afforded to a person before his real property is seized and destroyed in order to

20

abate or rehabilitate an "urban nuisance."  In a case such as the present one, there is need for equally rigorous adherence to the principles of Due Process as in civil forfeitures of real property. The City of Dallas has pecuniary interests

in the outcome of such proceedings, e.g., justification for federal and state urban renewal grants; enhancement of the municipal tax base by promoting the replacement of old buildings with new ones.  The need  for safeguards against arbitrary, capricious or unreasonable seizures based on subjective standards may be even greater in "urban nuisance" or "urban rehabilitation" cases.  Moreover, a post-seizure hearing cannot provide any remedy in such cases because the destroyed property cannot be restored and the best evidence of whether the seizure was justified will have been demolished also.  It is not necessary to accomplish the City's legitimate goals of urban rehabilitation that an owner whose real property the City proposes to destroy be deprived of an opportunity for a meaningful pre-seizure adversary hearing before a neutral and impartial judge or magistrate.  Requiring the City to postpone seizure and destruction until after such a hearing and judicial determination that the seizure is justified creates no significant administrative burden. And any harm that results from delay is minimal in comparison to the injury occasioned by the erroneous seizure and destruction of real property.  Id. at 59.